UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **KAYLA COUNTS, KAYLYNN MAJOR, and NATHAN CHURCHILL,** individually, and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>**WAYFAIR LLC**, a Delaware Limited Liability Corporation,<br><br>Defendant. | Case No.: 23-cv-11706-FDS<br><br>Hon.: F. Dennis Saylor IV |

# PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THE PRE-DISCOVERY MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE

I.  INTRODUCTION

On February 6, 2024, the Court heard oral arguments on Plaintiffs' Pre-Discovery Motion for Conditional Certification and Court-Authorized Notice (the "Motion"). "[O]n the assumption that [the Court] will certify a collective action in light of the lenient standard," the Court ordered the parties' to submit supplemental briefs on a collective definition that reflects a "reasonable degree of specificity" regarding who is to receive notice. *Exhibit 1*, Transcript at 20-21.

At the hearing, Defendant proposed "limiting the collective to the specific job titles of the named plaintiffs." *Id*., p. 15. However, in this case, such a proposal is problematic. Plainly put, Defendant has been deceptive, misleading, and outright dishonest with its arguments relative to "job tiles" in opposition to Plaintiffs' Motion.

First, at the hearing, Defense Counsel represented to the Court that "[t]here is no job title of customer service representative." *Id*., p. 11. However, as the attached documents illustrate, Defense Counsel's assertion in this regard is demonstrably false. The documents supplied by Plaintiff Churchill illustrate that he was hired for Defendant's "**Customer Service Representative** role." *Exhibit 2, Churchill Onboarding Documents* (emphasis added). Additionally, screenshots from Defendant's website demonstrate that, as recently as 2023, Defendant was actively advertising and hiring for its "Remote Customer Service Representative" position. *Exhibit 3, CSR Job Posting*. Similarly, Defendant advertised for a position it titled "Virtual Customer Service Consultant," which had the *same* job description as its "Remote Customer Service Representatives." *Exhibit 4, CSC Job Posting*.

Next, Defense Counsel claims "[t]here is no job title of sales representative." *Exh. 1*, p. 11. Defendant's offer letter to Plaintiff Counts' exposes this misrepresentation, and states "[w]e are pleased to offer you the B2C Inbound **Sales Representative** position." *Exhibit 5*, *Counts Offer*

1

*Letter* (emphasis added). And in furtherance of this deception, Defendant submitted a declaration from Counts' supervisor that claims her job title was "Sales Agent Generalist." D.E. 32-2 at 2. Moreover, in 2023, Defendant was advertising for the position "Inbound Sales Agent: Virtual," which was also referred to within the job positing and description as "Remote Inbound **Sales Representative**." *Exhibit 6, ISA/ISR Job Posting*. Despite the varying titles offered by Defendant, Plaintiff Counts held one, and only one, job for Defendant.

After the hearing, but prior to filing this supplemental brief, Plaintiffs' Counsel requested a meet-and-confer with Defendant to discuss and narrow areas of agreement and dispute. Defendant rejected Plaintiffs' request citing "the reasons explained in [Defendant's] briefing and at the hearing." Defendant's refusal to discuss these issues underscores its attempts to improperly obfuscate any proposed Collective definition by manipulating job titles. For these reasons, Plaintiffs' revised collective definition focuses on *duties performed*, rather than job titles.

In truth, no clarification of the Collective definition was ever truly needed – Defendant's charade about job titles is nothing more than an attempt to muddy the relatively straightforward issues at bar. Nevertheless, for the reasons explained herein, Plaintiffs propose the following revised collective definition:

> **All hourly remote employees who are responsible for handling inbound phone calls, chats, or emails for the entirety of their shift from Wayfair's non-business customers regarding existing product orders or new product orders. This includes employees between [*insert 3 years from Order*] to the present, and specifically does not include any individual subject to an arbitration agreement or supervisory employees.**

## II.    STATEMENT OF ADDITIONAL FACTS

### A. Remote (Frontline) Customer Service Representatives

To begin, the entire argument that Defendant does not employ a group of homogenous hourly employees that assist its customers with orders is absurd and false. The absurdity is

2

exacerbated by the patently misleading or even false assertions that certain job titles do not exist.[1]

In 2023, Defendant advertised for a position titled "Customer Service Representative – Work from Home." *Exhibit 2*. The job posting contains a subheading "What Does a Service Representative Do?" – then sets forth the basic job duties.

Similarly, Defendant has recently advertised for "Virtual Customer Service Consultant." The job description for Virtual Customer Service Consultant is essentially *identical* to the job description for Customer Service Representative – Work From Home. *Exhibit 4*.

Specifically, the job descriptions for both positions provide the following:

- **Demonstrate Reliability:** Attendance and commitment to being present and on time for your full shift each day is crucial. This helps ensure we're ready and available to help our customers when they need us most.
- **Handles a High Volume of Contacts:** You will handle an estimated 50-60 calls per shift. This is a face paced environment and highly structured. There is little down time in this position as you are typically on back to back calls during your shift.
- **Meets Our Performance Bar:** You'll work to exceed customer satisfaction, excel in meeting customer service efficiency metrics, and other responsibilities as assigned.
- **Engages Customers:** You'll need a passion for people. You'll be the voice of Wayfair and work to build a relationship with customers who contact us by inbound phone call, chats, and emails. Topics can range from returns, replacements, delivery, product availability, order status, and more.
- **Listens Actively and Shows Empathy:** You will actively listen to understand relevant customer information to find the best way to solve their problem quickly and thoroughly.
- **De-Escalates Customer Concerns:** Most customers contact us because they've had a problem and they need your help. You will use your conflict management skills to balance the needs of the customer with the options from the business while always maintaining a professional composure.
- **Problem Solves:** Solutions aren't a one-size-fits-all approach so customer service associates do not read from pre-populated scripts. You will be given a level of autonomy to help customers find the right solution. You'll need to think analytically to solve customer problems in a first contact resolution approach.

---

[1] "Every lawyer is an officer of the court [and] has a duty of candor to the tribunal." *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 38 (1st Cir. 1999) (quoting *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994)).

- **Multitasks:** You'll need to juggle navigating multiple browsers, tabs, tools, and screens in order to quickly and effectively answer questions. The ideal customer service representative will be familiar with computers and can effectively navigate technology on a daily basis.
- **Escalates Systemic Issues:** Help us continuously improve. You'll identify areas where improvement is needed and share those trends with leadership.

At the hearing, Plaintiffs' Counsel warned that Defendant was playing a game of "nomenclatures as far as these different job titles … they could change those tomorrow." *Exh. 1*, p. 20. It should not go unnoticed that the job description for Virtual Customer Service Consultant, standing alone, uses the position titles "Service Associate" *and* "customer service representative." Likewise, Defendant's own declarants use a variety of titles to refer to the same position, for example: "frontline customer service specialist" [D.E. 32-1], "Customer Service Agents" [D.E. 32-4], or "Service Agents" [D.E. 32-6]. Despite these varying titles, the salient point is that all of these employees are performing similar duties – assisting Defendant's customers with their orders. In fact, they have virtually identical position descriptions and the policies referenced in the Motion apply to all of these individuals.

As Plaintiffs have explained from the onset, the members of the putative collective either receive inbound calls from customers regarding an existing order[2] or receive inbound calls from customers that wish to place a new order.[3] In fact, Wayfair's "Knowledge Hub" explains to employees what to say if a caller selects the wrong prompt (existing order or new order) when they call in. See *Exhibit 7*, How to Transfer.

B. **Inbound Sales Representatives**

---

[2] Examples of titles used by Defendant to reference these individuals includes: Customer Service Representatives (Exh. 2-3), Virtual Customer Service Consultants (Exh. 4), Frontline Customer Service Specialists (32-1), and Customer Service Agents (D.E. 32-4).
[3] Examples of titles used by Defendant to reference these individuals includes: Inbound Sales Representative (Exh. 5), Inbound Sales Agent (Exh. 6), Inbound Sales Representative (Exh. 6), and Sales Agent Generalist (D.E. 32-2).

Customers calling to place a new order, rather than seeking assistance with an existing order, are routed to Defendant's B2C (business to customer) Inbound Sales Representatives. While Defense Counsel has argued no "sales representative" title existed, Plaintiff Counts's offer letter illustrates that argument is patently false. *See* Exh. 1, p. 11; Exh. 5. Moreover, once again, the job postings and position descriptions on Defendant's website use varying titles such as "Inbound Sales Agent: Virtual" and "Remote Inbound Sales Representative" interchangeably. Exh. 6.

Under the subtitle "What You'll Do" the basic job duties of the sales representatives are explained. "This is a virtual, inbound sales agent role and during your shift, you will handle inbound sales calls, (approximately 40 a day) cheerfully assisting customers in finding and purchasing their desired items." *Id*. Notably, and consistent with Plaintiffs' allegations, the job posting requires sales representatives to "[c]ome to your shift ready for the day, clocked in, signed in and ready to offer a top-notch customer buying experience." *Id*.

### C. Care and Resolution Experts

Finally, Defendant's hourly Customer and Resolution Experts (CARE) receive calls, chats, and emails directly from Defendant's customers, but also must be prepared to receive escalated calls from less experienced customer service representatives or sales agents. Defendant's Knowledge Hub explains the three types of calls, emails, or chats the CARE responds to: 1) Help Desk; 2) Escalation; and 3) Direct Customer contact. *Exhibit 8*, CARE Call Types.

### D. Uniform Clock-In Procedure and Call-Ready Programs

According to Plaintiffs, regardless of the technical title used by Defendant, each of the positions at issue are required to be call-ready/chat-ready at the start of their shift and must continuously field inbound calls, chats, or emails for the entirety of their shift regarding existing or new product orders. *See* PL Decls., D.E. 30-3 to 30-9. At the hearing, Defense Counsel

explained the uniform clock-in procedure and "Call Ready Programs" identified in the Opposition that apply to the individuals "who field incoming calls for the entirety of their shift."

*The Clocking-In Procedure*: At page 2 of its opposition, D.E. 32, Defendant concedes that all affected employees are "trained to take the following steps at the beginning of their remote shift:" That procedure, which involves the Okta website, and Workday program, is identical for every remote employee. Defendant's Opposition Manager declarations (A-C[4]) which deal with remote employees in the customer service, sales, and CARE departments echo this clock in procedure. Thus, the proposed FLSA Collective does not encompass any employee that is subject to a different timekeeping system.

*The Call Ready/Chat Ready Programs:* Plaintiffs allege that they are required to be "call-ready" at the start of their shifts. Defendant disputes the time that the employees need to be "call-ready" but nevertheless agrees that they are required to be "call-ready." Going even further, Defendant explains what programs must be opened to be "call ready." It refers to those as the "Call Ready Programs" in its Manager Declarations at paragraphs 9-10 and in its Opposition at page 3. Defendant explains the process as follows:

> Only after clocking in, CSEs open the "essential work programs" they need to do their jobs. (Manager Decl. ¶ 10.) The essential work programs vary from CSE to CSE depending on their job duties. Some CSEs field incoming calls, emails, or chats from customers for their entire shift. (*See generally* Manager Decl.) These CSEs must take the steps to become "call-ready" (*i.e.*, ready to field customer calls, emails, or chats) right after clocking in. (Manager Decl. ¶¶ 9- 10.) To be call-ready, these CSEs: (1) connect to VPN and (2) access ServiceHub/AdminHome (to access information about orders), Cisco Finesse (to access the queue of customers), and Cisco Jabber (for phone calls) or Waycomm (for chats or emails). (Manager Decl. ¶ 10.) Together, these programs are referred to as the "Call-Ready Programs."

D.E. 32 at 5.

For the reasons already stated in both parties' papers, Plaintiffs proposed Collective

---

[4] D.E. 32-1 through 32-3

definition is limited to remote employees that must be "call ready" with the "Call-Ready Programs." Wayfair has the data and information to identify the employees that fit this criterion.

### E. Uniform Virtual Employee Requirements and Process – Hourly Employees

Defendant does not dispute that the technical downtime policy, titled "Virtual Employee Requirements and Process – Hourly Employees," applied to the hourly employees in each of the three positions at issue in this case. Rather, Defendant has raised a factual dispute as to the interpretation and application of said policy. Among other things, that policy states "Wayfair will not reimburse for time missed as a result of technical issues." D.E. 30-13 at 6. Whether Plaintiffs' or Defendant's interpretation of the policy is ultimately proven to be correct, this issue is not decided at the conditional certification stage.

For purposes of conditional certification, it suffices that the policy applied to the entire Collective and that, if proven true, Plaintiffs have alleged a violation of the FLSA.

### III.  PROPOSED COLLECTIVE DEFINITION

Given the fact that Defendant is constantly shuffling and mixing up its own job titles, Plaintiffs propose a definition for the collective based on job duties, rather than titles.

> **All hourly remote employees who are responsible for handling inbound phone calls, chats, or emails for the entirety of their shift from Wayfair's non-business customers regarding existing product orders or new product orders. This includes employees between [*insert 3 years from Order*] to the present, and specifically does not include any individual subject to an arbitration agreement or supervisory employees.**

This definition is reasonable and specific for several reasons.

At the hearing, Defense Counsel explained that its Opposition brief set forth a uniform computer bootup process and uniform list of "call-ready" programs for the hourly employees that were responsible for "field[ing] incoming calls for the entirety of their shift." *Exh. 1*, p. 17. Thus,

7

the employees that fall within the above definition will be similar (if not identical) in their job duties and the computer programs they use to complete said duties.

Next, the collective definition excludes positions such as "trainers," which Defendant claims are only *sometimes* responsible for fielding inbound calls.

Additionally, the above collective definition excludes employees who are not responsible for fielding inbound calls, chats, or emails from business customers (*e.g.* suppliers). In its Opposition, and at the hearing, Defendant argued that the Collective definition, as initially proposed, could be interpreted to include employees that field calls from its business customers, though Plaintiffs' obviously never intended to include those individuals. D.E. 32, 3; *Exh. 1*, 17-18.

Additionally, the above collective definition excludes positions such Fraud Specialists, which Plaintiffs also did not intend to include, because Fraud Specialists are not expected to field incoming calls from Defendant's non-business customers.

Finally, the above collective definition expressly excludes any employee that signed an arbitration agreement with Defendant. Thus, the revised definition addresses the stated concerns.

## IV.    ARGUMENT

### A. The Revised Collective Definition

At the conditional-certification stage, "courts routinely grant certification where the proposed class members' job titles or duties are not exactly the same, as long as they are similar." *Lichy v. Centerline Commc'ns LLC*, 2018 WL 1524534, at *3 (D. Mass. Mar. 28, 2018) (collecting cases). More recently, Your Honor reiterated this well-settled principle when granting conditional certification in *Drake v. Tufts Associated Health Maint. Org., Inc.*, No. CV 19-11876-FDS, 2021 WL 2767308, at *5 (D. Mass. Feb. 12, 2021). "Different job titles or positions do not preclude a finding that plaintiffs are similarly situated." *Trezvant v. Fid. Emp. Servs. Corp.*, 434 F. Supp. 2d

40, 48 (D. Mass. 2006). Regardless of job title, conditional certification is appropriate where "the 'general nature and level of work performed by employees within this classification' is sufficient to satisfy the minimal showing necessary to justify issuing notice." *Cunha v. Avis Budget Car Rental, LLC*, 221 F. Supp. 3d 178, 182 (D. Mass. 2016).[5]

This case illustrates precisely why variations in job titles are not determinative of whether an individual should receive notice. Here, Defendant uses multiple titles to refer to the same position. While Defendant criticizes Plaintiffs for their use of the job titles, Defendant itself cannot keep its ever-changing job titles straight. As illustrated in the attached position descriptions, Defendant uses various titles interchangeably to reference the positions at issue – including the terms used by Plaintiffs, which, at the hearing, Defense Counsel claimed did not exist. Confusingly, after claiming the titles "customer service representative" and "sale representative" do not exist, Defense Counsel explained at the hearing that "Wayfair employs trainers to train both its customer service representatives and its sales representatives." *Exh*. 1, p. 13. Moreover, the Opposition and the declarants also used terms like "customer service representative." *See* D.E. 32, Opposition at 15 ("Mistrot also worked for Wayfair as a customer service representative before her role as a trainer"); D.E. 32-4, Greer Decl. at ¶ 37 (same).

In sum, Defendant has created a debate over the semantics in its use of job titles. The record is devoid of any substantive explanation of how "customer service specialists" vary from

---

[5] "The mere fact that plaintiffs have different job titles…is not relevant to the question of whether they are 'similarly situated.'" *Diaz v. New York Paving Inc.,* 340 F. Supp. 3d 372, 384–85 (S.D.N.Y. 2018), citing *Taveras v. D & J Real Estate Mgmt. II, LLC,* 324 F.R.D. 39, 44 (S.D.N.Y. 2018) ("different job titles may be included within a conditional collective if there is evidence that plaintiffs may be similarly situated as to a common policy to violate the FLSA") (citing cases). Moreover, case law recognizes that "whether variance of job duties precludes collective treatment is more appropriately analyzed at the decertification stage of an FLSA collective action, not at the conditional certification stage." *Id*. at 45 (citing *Romero v. H.B. Auto. Grp.,* 2012 WL 1514810, at *8 (S.D.N.Y. May 1, 2012)).

"customer service agents," "customer service representatives," or "customer service consultants." As illustrated herein, all those job titles are responsible for fielding inbound calls regarding *existing* orders. Similarly, for purposes of conditional certification, there is no material difference between a "sales agent generalist," "inbound sales specialist," "inbound sales representative," and an "inbound sales agent." Each of those titles refers to an individual tasked with answering inbound calls from customers trying to place *new* product orders.

Regardless, the revised collective definition addresses the inconsistencies in Defendant's use of job titles, as it is based on the employee's duties rather than a specific title. Should the Court adopt Defendant's suggestion of limiting the scope of the Collective to the Plaintiffs' specific job titles, for example "Service Specialist II Service Security," countless individuals who should receive notice would not receive notice. Inevitably, statutes of limitations would run on claims and the remedial purpose of the FLSA would not be fulfilled.

For all the reasons set forth herein, Plaintiffs respectfully request that the Court adopt their revised Collective definition.

### B. The Substance of Plaintiffs' Proposed Notice to the Collective

Ideally, Defendant would have agreed to confer with Plaintiffs regarding the issues addressed in this supplemental brief, including the substance of the notice and methodology of distributing notice. Plaintiffs believe the form of their proposed notice is fair, balanced, and properly notifies members of the Collective about this case. However, Plaintiffs will consider each of the edits proposed by Defendant in good faith.

First, Plaintiffs have already agreed to exclude the employees subject to arbitration agreements, and that is confirmed by the revised Collective definition. Furthermore, Plaintiffs have no objection to any of the proposed revisions on page 1 of the proposed notice. *See* D.E. 32-12 at

p. 2. However, Plaintiffs do strongly object to several of the edits proposed by Defendant in the pages that follow. Those objections are explained below.

**1. Threats Regarding Defendant's Access to the Collective's Social Media Accounts[6]**

Plaintiffs are aware that Defendant is seeking to insert a paragraph that Your Honor approved three years ago in the *Drake* case (cited above) pertaining to discovery obligations. However, in *Drake*, the significance of telling opt-ins that Defendant may be given <u>blanket</u> access to their social media accounts was not properly presented to the Court. While the underlying briefing correctly argued that obtaining discovery from opt-ins' social media accounts was "far from certain, and therefore should not, on balance be included in the [n]otice," the briefing was otherwise silent on the significance of singling out social media accounts. *See* Case No. 19-cv-11876, D.E. 43 at 14.

Respectfully, two other Courts in this District have expressly rejected the language used in *Drake* (and now proposed by Defendant) and refused to allow the defendant to single out the opt-ins' social media accounts as an avenue for obtaining discovery. *See Gardner v. Fallon Health & Life Ins. Co., Inc.*, No. CV 4:19-40148-TSH, 2021 WL 4459525, at *5 (D. Mass. Sept. 29, 2021) (holding "the defendants do not identify any specific 'risks' in their briefing, nor do they explain why the parties' social media accounts should be singled out."); *Clark v. Cap. Vision Servs., LLC*, No. 22-CV-10236-DJC, 2022 WL 2905356, at *5 (D. Mass. July 22, 2022) (removing references to obtaining discovery from social media accounts).

---

[6] Generally, FLSA defendants are not entitled to discover plaintiffs' social media posts. *See, e.g., Palma v. Metro PCS Wireless, Inc.*, 18 F. Supp. 3d 1346, 1348 (M.D. Fla. 2014) ("Although some of the Plaintiffs testified to reading social media at some point during their work day, this does not, in and of itself, transform Plaintiffs' social media posts into discoverable information."); *Jewell v. Aaron's, Inc.*, 2013 WL 3770837, at *3 (N.D. Ga. July 19, 2013) (finding, in FLSA case, defendant-employer not entitled to discovery of social media posts, because it had not shown relevance of the information, and to produce it would be too burdensome).

The reality is that many people use social media to communicate regarding their most private and intimate matters. Of course, such communications would never be admissible, or even discoverable, but the opt-ins may not know that. As written, Defendant's proposal specifically identifies the opt-ins social media accounts as "evidence," without knowing whether any discoverable information is contained therein. Regardless, as the Court is no doubt aware, social media giants, including Mark Zuckerberg, have recently been called to publicly testify (and apologize) in congress for the mental harm social media causes to young people (including suicide). The nightmare of having someone else, especially an attorney or a court, access those private and intimate social media communications is more than enough to deter any individual from exercising their rights under the FLSA.

Given the claims at issue in this case, the likelihood of any discoverable evidence being stored in an opt-in's social media account is next to *zero*. Make no mistake, Defendant's inclusion of a reference to accessing social media accounts is designed specifically to chill participation. Surely, this serious issue flew under the radar when the Court approved the language in *Drake*.

Above all other concerns with the Notice, Plaintiffs ask the Court to seriously reconsider allowing Defendants to threaten rummaging through opt-ins social media accounts in the Notice.

2. **The Remaining Language Regarding Opt-Ins Discovery Obligations**

The entirety of the language Defendant proposes inserting into Section 4 of the Notice reads as follows:

> If you opt into this lawsuit, you will assume the role of a party to the litigation, which comes with certain obligations and risks. If you join the case, you may be asked to provide relevant documents, respond to written questions, and provide testimony under oath at deposition, which may take place remotely (via videoconferencing) or in Boston, Massachusetts. You may also be required to attend and testify at the trial of this matter, which may also take place remotely (via videoconferencing) or in Boston. Finally, you will be required to preserve and produce evidence including, but not limited to, your social media accounts for the

relevant time period, potentially at your own expense.

Plaintiffs propose revising this insertion as follows:

If you opt into this lawsuit, you will assume the role of a party to the litigation, which comes with certain obligations. If you join the case, you may be asked to provide relevant documents, respond to written questions, and provide testimony under oath at deposition. You may also be required to attend and testify at the trial of this matter. Finally, to the extent you have any documents or information related to your employment with Wayfair or the claims asserted in this case, you will be required to preserve and (potentially) produce the documents and information.

Plaintiffs' revisions address the concerns raised by the Court in *Drake*, without including the language designed to chill participation. In *Clark*, the court rejected the same paragraph that the Defendant seeks to insert in the Plaintiffs' proposed FLSA notice finding the language to be "overbroad, [and] assumes all opt-in plaintiffs will be subject to discovery and that any appearances will be in person and, in the proposed form, may chill participation." *Id*. Additionally, as stated above, the same language was rejected in *Gardner*.

From a practical perspective, the putative Collective members are hourly employees of modest financial means. Airfare and lodging to Boston would likely cost several thousand dollars, which is more money than they earn in an entire month. Other putative Collective members could be restricted from traveling due to a disability. These individuals will likely believe they cannot participate in the case, purely from a practical perspective. Forcing them to file their own cases in their home states where Defendant employed them is wildly inefficient for the plaintiff, the defendant, and the Court. It is also inconsistent with the spirit of 29 U.S.C. 216(b).

**C. Text Message Notice Should Be Considered On a Case-by-Case Basis and the Present Case Justifies Text Message Notice**

In the Opposition, Defendant argues sending a short text message reminder notice about this case is "unduly intrusive." However, whether to send notice by text message should be decided

13

on a case-by-case basis. And this case, perhaps more than any other, justifies the single short reminder notice proposed by Plaintiffs in the Motion.[7] [D.E. 30-2.]

First, in this case, Defendant already requires all the putative Collective members to receive *two* text messages on their personal cellphones each time they clock-in or connect to the VPN. As the Court will recall, Defendant utilizes a dual-authentication process (via Okta) in which the remote employees must receive a code by text message to their personal cell phone, then input the code into either Workday or Cisco Anytime Connect (the VPN). Stated differently, in this case, Defendant has established a pattern and practice of notifying the employees of critical work-related information through their personal cell phones, and Plaintiffs have already consented to the same. *See Gardner* at *4 (D. Mass. Sept. 29, 2021) (approving text notice and holding "[t]hese channels will help ensure that potential opt-in plaintiffs receive notice of the collective action.").

Second, the turnover rate for the remote employees that make up the Collective is extremely high, and text-message is likely the best way to reach them.

Therefore, taking in consideration the facts of *this* case, and specifically, the fact that the opt-ins have already consented to receiving Wayfair related communications via text every working day, text message notice is appropriate along with mail and e-mail. The reasons mail and e-mail are appropriate were addressed in the Motion.

V.   CONCLUSION

For all of the reasons stated herein, Plaintiffs have identified a proposed Collective with a "reasonable degree of specificity," as the Court ordered. This case is at the step-one conditional certification stage. While Plaintiffs are certain they will survive any decertification motion,

---

[7] There is also tremendous hypocrisy in Defendant's argument that they are concerned about being "unduly intrusive" in sending a text message to opt-ins when, at the same time, they are threatening to ransack their social media accounts as "evidence" if they join the case.

14

Defendant will have the opportunity (if appropriate) to move for decertification at the close of discovery. Prompt distribution of notice is needed to notify the putative Collective of the case, so they can opt-in and stop the statute of limitations from running. Plaintiffs have met the lenient standard and should be given the opportunity to present evidence of their claims.

Dated: February 13, 2024        Respectfully Submitted by Counsel for Plaintiffs,

**ASH LAW, PLLC**

*s/ Charles R. Ash, IV*_____
Charles R. Ash, IV (P73877) (*Admitted Pro Hac Vice*)
402 W. Liberty St.
Ann Arbor, MI 48103-4388
Phone: (734) 234-5583
cash@nationalwagelaw.com

**MORGAN & MORGAN, P.A.**
Andrew R. Frisch (FBN 27777) (*Admitted Pro Hac Vice*)
8151 Peters Road, 4th Floor
Plantation, FL 33324
Phone: (954) 318-0268
afrisch@forthepeople.com

**MORGAN & MORGAN, P.A.**
Kelsey Raycroft Rose (Admitted)
155 Federal Street, Suite 1502
Boston, MA 02110
Phone: (857) 383-4903
kraycroftrose@forthepeople.com

**HOOPER HATHAWAY, P.C.**
Oscar Rodriguez (P73413) (*Admitted Pro Hac Vice*)
126 S. Main St.
Ann Arbor, MI 48104-1903
Phone: (734) 662-4426
orod@hooperhathaway.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*s/ Charles R. Ash, IV*