# EXHIBIT 1

1
2                          UNITED STATES DISTRICT COURT
                            DISTRICT OF MASSACHUSETTS
3

4      KAYLA COUNTS, KAYLYNN MAJOR,         )
       AND NATHAN CHURCHILL,                )
5      individually, and                    )
       on behalf of others similarly        )
6      situated,                            )  Civil Action
                              Plaintiff,    )
7                                           )  No. 23-11706-FDS
       vs.                                  )
8                                           )
       WAYFAIR, LLC,
9                              Defendant.

10

11     BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR

12

13                            MOTION HEARING

14

15
              John Joseph Moakley United States Courthouse
16                          Courtroom No. 10
                            1 Courthouse Way
17                          Boston, MA 02210

18

19                          February 6, 2024
                              10:00 a.m.
20

21

22

23                          Valerie A. O'Hara
                          Official Court Reporter
              John Joseph Moakley United States Courthouse
24                          1 Courthouse Way
                            Boston, MA 02210
25                     E-mail: vaohara@gmail.com

1    APPEARANCES:

2    <u>For the Plaintiffs</u>:

3          Ash Law, PLLC, Wage & Hour, by CHARLES R. ASH, IV, ESQ.,
     402 West Liberty Street, Ann Arbor, Michigan 48103-4388;

4
           Hooper Hathaway, P.C., by OSCAR A. RODRIGUEZ, ESQ.,
5    126 South Main Street, Ann Arbor, Michigan 48104;

6    <u>For the Defendants</u>:

7          Nutter, McClennen & Fish, LLP, by MELANIE V. WOODWARD,
     ATTORNEY, CHRISTOPHER H. LINDSTROM, ESQ., and MAYA GINGA
8    RITCHIE, ATTORNEY, Seaport West, 155 Seaport Boulevard,
     Boston, Massachusetts 02210-2604;

9
     VIA ZOOM:
10
     <u>For the Plaintiffs</u>:
11
           Morgan & Morgan, P.A., by ANDREW FRISCH, ESQ.,
12   8151 Peters Road, 4th Floor
     Plantation, FL 33324.

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2       THE CLERK:  All rise.  Court is now in session in the

3   matter of Counts vs. Wayfair, Civil Action Number 23-11706.

4       Participants are reminded that photographing,

5   recording or rebroadcasting of this hearing is prohibited and

6   may result in sanctions.

7       Would counsel please identify themselves for the

8   record, starting with the plaintiff.

9       MR. ASH:  Good morning, your Honor, Charles Ash

10  appearing on behalf of the plaintiffs and accompanied by

11  Oscar Rodriguez, and we've got Andrew Frisch joining us

12  remotely.

13      THE COURT:  Good morning, all.

14      MR. FRISCH:  Good morning, your Honor.

15      THE COURT:  Mr. Frisch?

16      MR. FRISCH:  Yes.  Good morning, your Honor.

17      THE COURT:  Ms. Woodward.

18      MR. FRISCH:  Good to see you again.  I think the last

19  time I saw you, we were in your kitchen.

20      THE COURT:  In my kitchen?

21      MR. FRISCH:  I think on a Zoom a couple of years ago.

22      THE COURT:  I don't normally do anything from my

23  kitchen.  I don't think I have a camera there, but you get

24  older, you forget things.  Ms. Woodward.

25      MS. WOODWARD:  Good morning, your Honor,

1   Melanie Woodward on behalf of Wayfair, and I'm here with my

2   colleagues, Christopher Lindstrom and Maya Ritchie.

3          THE COURT:  Good morning, all.  This is a hearing on

4   plaintiff's motion for conditional certification and issuance

5   of a notice.  So who is taking the lead for plaintiff?

6          MR. ASH:  Good morning, your Honor, I will be,

7   Charles Ash on behalf of plaintiff.  Would you prefer that I

8   stand or should I remain seated?

9          THE COURT:  If you're asking what my preference is, my

10:03AM 10  preference is that you stand, but I'm not going to order you to

11  stand.

12         MR. ASH:  Of course, happy to.

13         THE COURT:  Dignity of the court and all that.

14         MR. ASH:  Yes, that's fine.  I'm more than happy to

15  stand, and, your Honor, I know that you had the opportunity to

16  review all the papers on this case.  I think that it is pretty

17  clear that we have met the very lenient standard that's

18  required at this stage of the litigation.

19         There were some back and forth in the paper about some

10:04AM 20  issues that I think are maybe not presently before the Court

21  right now, but if you begin by looking at the issues, the

22  things that we agree on, I think you can really narrow the

23  scope of the analysis of what it is that we're arguing about in

24  this particular motion.

25         So, to begin, we agree that all of the CSEs, and,

1    again, just to clarify, the term CSE is something, a term that

2    we came up with to refer to three different positions, three

3    specific positions.

4         THE COURT:  Let me pause there.  I'm concerned, since

5    it's not an actual Wayfair title, that if I do certify that the

6    notice goes out, and it's like the first line of the notice is

7    this, you know, applies to CSEs, and I'm concerned, that would

8    be confusing.  I understand why you're using it as shorthand

9    now but for the actual employees.

10:05AM 10         MR. ASH:  We're actually amenable to altering the

11    notice to just use the three specific job titles that we're

12    targeting and not the term, "CSE," so that's an easy red line

13    of the notice, but for purposes of today, as you said, just

14    shorthand for the argument for the convenience of the Court, I

15    use the term, "CSE."  That's a term we came up with.

16         We agree that all CSEs, both the plaintiff and the

17    defendant agree that all CSEs should use all the same computer

18    programs.  There also appears to be no real dispute, at least

19    from what I can tell, in the job duties of the three different

10:05AM 20    positions for the CSEs.

21         Now, they expanded the term to include that some

22    positions that we did not intend to include in this case, but

23    for the positions at issue, there is an agreement between the

24    parties as far as the programs, the job duties, and there's

25    also an agreement that the CSEs are prohibited from clocking in

1    after the start of their scheduled shift.

2         The papers presented by the defendant have created a
3    fact issue about whether or not the plaintiffs need to be call
4    ready at the start of their scheduled shift, but that's not an
5    issue that would defeat certification.

6         We've got 12 different people that have joined this
7    case.  There were 13.  We had one that shouldn't have been
8    included.  She was outside the statute of limitations, 12
9    different people that have joined this case.  We submitted
10:06AM 10  declarations from each of them that say that they're required
11   to be call ready.  Notably, the documents that were attached by
12   the time records that were attached by defendant to their
13   motion support this conclusion that they were supposed to be
14   call ready at the start of their scheduled shift.

15        It also supports the conclusion, as the written
16   policy, that indisputably applies to all CSEs.  In fact, it
17   applies to all hourly employees says that the CSEs are required
18   to record their time consistent with their scheduled hours,
19   which, of course, that is a facially unlawful policy.

10:07AM 20       Those records the defendant attached support that that
21   was, in fact, happening.  I think plaintiff Churchill is
22   probably the best example.  He was at like 96 percent of the
23   time, he was clocked in at the start of his scheduled shift,
24   but, again, those -- the point is that we have identified a
25   policy that, local policies, that are facially unlawful first

1    beginning with the timekeeping policy, which supplanted and

2    replaced the policy that the defendant is relying on in their

3    opposition.

4          We then identified the technical time policy, which

5    prohibits any technical time from being compensable, and it

6    specifically addresses trouble shooting, it gives the example

7    of trouble shooting issues with Cisco.

8          Now, the defendant's policy says that that's not

9    compensable time.  The law says that it is compensable time.

10:08AM 10   There's no dispute that that policy applied to everyone.  Well,

11   what the defendants have done in their opposition is they've

12   used manager declarations to spin or even alter their own

13   written policies.

14         And I think that's inappropriate at this stage, and,

15   like I said, between the timekeeping policy that applied to

16   everyone, the technical time policy, and the policy prohibiting

17   any overtime without always getting manager approval, those are

18   all unlawful policies in the scheme of this case, and for those

19   reasons, I think that we have met our burden, our lenient

10:09AM 20   burden to establish that these individuals are similarly

21   situated.

22         THE COURT:  What about the point that for certain

23   employees, I think it's starting at January 1st of last year,

24   if I have the date right, are subject to an arbitration

25   agreement, and, therefore, need to be excluded?

1        MR. ASH:  Judge, we're not going to press that issue,

2   we're happy to exclude them.

3        THE COURT:  All right.  Ms. Woodward, are you taking

4   the lead?

5        MS. WOODWARD:  Yes, your Honor.  At the outset, your

6   Honor, I just want to be crystal clear about what exactly the

7   standard is so we can really hone in on the details that get to

8   that standard.

9        So the standard is a lenient one, but it has to mean

10  something, and plaintiffs have the burden here to show two

11  things:  They have to show that, Number 1, the members of their

12  proposed collective are subject to an unlawful policy or plan.

13  And, Number 2, they have to show that that unlawful policy was

14  common to all members of the collective, and I want to spend

15  just a little bit of time on the first point about the policies

16  but most of my time here on the second point about whether

17  those policies are common to all members of the collective

18  because I think that's a little bit more of a straightforward

19  argument.

20        Your Honor, here the policies that the plaintiffs have

21  raised, the common sense reading of those policies is that they

22  simply require employees to be on time, require employees to

23  work the shifts that are assigned to them, and require

24  employees to seek permission to work extra shifts.  They do not

25  require these employees to do the 10 to 15 minutes of overtime

1    work that they claim they do before a shift off the clock.

2    And plaintiffs in making their argument here are

3    hyperfocused on an instruction in Wayfair's employee guide that

4    states the time recorded in Wayfair's timekeeping system must

5    accurately reflect the schedule provided and that any deviation

6    must be approved in advance.

7    And Wayfair has submitted declarations from managers

8    of the named plaintiffs and the opt-in plaintiffs here not to

9    vary the meaning of that policy but just simply to explain that

10:11AM 10    it's holding plaintiffs -- it's holding employees to the

11    schedules that they are assigned to.  They can't simply work

12    whenever they want.

13    Those policies do not mean that a plaintiff can't, for

14    example, clock in a reasonable amount of time before their

15    shift, and, in fact, we know that the named plaintiffs here

16    were doing that.

17    We submitted clock-in data for the three named

18    plaintiffs here, and what we can see are often clocking in a

19    few minutes before the start of their shift, and, you know,

10:11AM 20    Wayfair offers that data simply to show that plaintiffs

21    themselves are not behaving in a way that is consistent with

22    their own interpretations of Wayfair's policies.

23    And plaintiffs cannot escape that objective reality

24    simply by saying that they're not allowed to clock in a few

25    minutes before or a few minutes after their scheduled shift,

1    but even putting that aside, the Court does not need to engage

2    with these arguments about Wayfair's policies and what they

3    mean or plaintiff's behavior.

4        The fact of the matter is that the collective here

5    should not be conditionally certified for a separate and a much

6    more straightforward reason, which is that these policies do

7    not apply to everybody in the proposed collective, and

8    responding to plaintiff's point, I think my friend said that we

9    all agree that all CSEs use the same programs, have the same

10   job duties.

11       Your Honor, we do not agree to that.  And the fact of

12   the matter is that the plaintiff's definition of their proposed

13   collective has been a moving target.  It has changed with

14   almost every filing that plaintiffs have made in this case.  It

15   started in the original complaint as a collective of what they

16   call customer service representatives, and including what they

17   describe as a variety of job titles, and including the job

18   title of fraud specialist, which now plaintiffs claim in their

19   reply brief is not a part of the collective.

20       And after Wayfair's answer to that, plaintiffs amended

21   the complaint and changed the definition to include just

22   customer service employees, seemingly broader, but, again,

23   still not sure exactly what that includes.

24       And in their opening brief, plaintiffs again change

25   the definition of their collective to be customer service

1    employees, which they define as employees whose primary job

2    responsibilities include assisting customers with placing

3    orders and answering questions about orders.

4         And they ostensibly limit this definition to three job

5    titles, but these are not job titles that Wayfair uses, and

6    that's the point that your Honor made earlier. There is no job

7    title of customer service representative. There is no job

8    title of sales representative. Wayfair has broad category of

9    jobs that fall under the front line customer service and front

10:14AM 10    line sales, but each of those broad categories contain dozens

11    of different job titles and employees who perform fundamentally

12    different work and are subject to fundamentally different

13    policies than the ones at issue here.

14         So, your Honor, at every turn, plaintiffs have tacitly

15    acknowledged the problems that Wayfair has raised with their

16    collective definition, and it repeatedly shifted that

17    definition to see if they can make something stick, and the

18    continuous shifting of that definition itself shows that this

19    case is not manageable as a collective action, but, more

10:14AM 20    importantly, even if we take the most recent iterations of

21    plaintiff's proposed collective definition that they've

22    articulated in their briefing to this motion, there are

23    employees that fall within those definitions but who are not

24    subject to the policies that are at issue here and who do not

25    perform the work that plaintiffs allege they perform off the

1    clock.

2              And I want to give just three key examples of that.

3    And the first one is a former opt-in plaintiff, Erica Dujardin,

4    who is a fraud specialist.  Fraud specialist falls squarely

5    within the definition of the proposed collective that

6    plaintiffs put forth in their opening brief.

7              The opening briefs of the collective includes customer

8    service representatives.  Fraud specialists fall under the

9    umbrella of front line customer service representatives at

10:15AM 10   Wayfair.

11             The opening brief says if the class includes employees

12   who answer questions about existing orders, fraud specialists

13   investigate customer questions about potentially fraudulent

14   orders, but fraud specialists do not communicate with customers

15   directly, and as a result, they do not log into the same

16   programs that plaintiffs allege they log into, and they are not

17   subject to the same policies that plaintiffs allege they are

18   subject to.

19             And, you know, apparently plaintiffs realize they had

10:16AM 20   a problem here, and they dismissed Ms. Dujardin's opt-in

21   notice, and, again, changed the definition of the collective in

22   their reply brief to clarify that it should include only

23   employees who directly speak to customers, but even under that

24   definition, there are still employees in this proposed

25   collective who are not subject to the policies at issue and do

1    not perform the work that plaintiffs allege they perform off

2    the clock.

3              One example of that, your Honor, is that Wayfair

4    employs trainers to train both its customer service

5    representatives and its sales representatives, and, in fact,

6    there's an opt-in plaintiff here who was a trainer for almost

7    the entire limitations period.

8              And plaintiffs do not dispute that trainers are not

9    subject to the policies that they claim are unlawful.  Instead,

10   to try to cure this problem, the reply brief simply says that

11   trainers are not going to be included in this class, but that's

12   impossible to reconcile with plaintiff's own definition of the

13   collective because trainers are front line customer service

14   employees, they are front line sales employees, and they are

15   required to spend a portion of their time fielding calls

16   directly from customers.

17             And there's also a third category of employees here

18   who serve as intermediaries between suppliers and customers.

19   They communicate messages to customers, customers return their

20   messages by email or phone call, and, your Honor, the fact that

21   there are this many employees that fall within plaintiff's

22   class definition yet are not subject to the policies that

23   plaintiff claim are unlawful means that the members of this

24   proposed collective are not subject to a common policy or plan,

25   and this collective should not be conditionally certified.  The

1    plaintiffs should not be allowed to escape that conclusion by

2    gerrymandering their own definition of the proposed collective

3    and cherry-picking positions that meet that definition they

4    want to include and which they don't.

5            And for those reasons, your Honor, Wayfair asks the

6    Court to deny plaintiff's motion to certify the class, and in

7    the event that the Court does grant that motion, we had our

8    argument, your Honor, which sounds like it's not an issue that

9    the employees who sign arbitration agreements should not be

10:18AM 10   included, but it sounds like we're good on that front.

11           THE COURT:  Would this problem be solved if plaintiffs

12   were required to be more specific?  I mean I'm doing this off

13   the top of my head, you know, job titles X, Y and Z but, you

14   know, who are subject to policies A, B or C or use programs D,

15   E or F, in other words, specificity?

16           I'm certainly sympathetic to the argument that it

17   needs to be defined.  As I'm sure you know, most of the time

18   these things are all hourly wage employees, you know, at

19   company X, something where you can glance and know whether

10:19AM 20   someone is in or out, but would that fix the problem?  In other

21   words, forcing plaintiffs to identify the program or policy at

22   issue, the job titles or duties of people subject to those

23   policies?  Would that solve the principal question?  Again,

24   this is all about notice, not summary judgment, as I'm not sure

25   you understand.  I can't decide whether you're right or wrong.

1    MS. WOODWARD:  I understand.  I think given the amount

2    of positions that we're sort of juggling here, Wayfair is at a

3    loss in terms of even if we did limit it, who would we include,

4    who would we not?

5        It's plaintiff's burden to define a collective, and we

6    still don't have a defined collective.  It's still even after

7    this hearing would need to be changed, and I suppose if

8    plaintiffs were agreeable to limiting the collective to the

9    specific job titles of the named plaintiffs here, that's

10:20AM  10    something that we could do, but it would have to be something

11    that narrow that we, Wayfair, could actually identify who is in

12    this class.

13    MR. ASH:  Your Honor, may I briefly reply?

14    THE COURT:  Yes.

15    MR. ASH:  To begin, you know, it's inevitable that

16    some differences are going to arise amongst people, job duties

17    and things like that.  That's not uncommon, but I think what is

18    important here to realize is that I think it's page 2 of their

19    opposition, they set forth what their proposed boot-up process

10:20AM  20    is, a four-step process they all use, they all turn on their

21    computer, they all have to go through the same dual

22    authentication process.

23        It's page -- opposition page 4, ECF 32-4 set forth

24    four steps that all of these people have to go through, and I

25    hear her saying that there's all these different job titles and

1    job positions, but I don't agree with that, and part of the

2    reason we are trying to narrow the collective is to address

3    this concern that she's trying to create, but when she cites to

4    her Number 1 example is Erica Dujardin, she did work in a

5    customer service position, a front line customer service, which

6    is outside of the statute of limitations, so we dismissed her.

7         The second person we cited to also worked in a

8    customer service position but then moved to a trainer, and for

9    the first time here today I learned that maybe trainer should

10   be included.

11        We had agreed not to include them, but the reason that

12   I forgot her name, what was the trainer's name?  Anyway, the

13   reason the trainer was primarily in the case is because prior

14   to becoming a trainer, she was a customer service

15   representative.

16        So, you know, the primary policies, the technical --

17   oh, one other thing.  On ECF-32, the defendant says all CSEs

18   must take the steps to become call ready, and they list off all

19   the programs that they have to -- they coin their own phrase

20   "call ready programs" throughout the opposition, so there is no

21   dispute that they're all using the same programs.

22        I think that the defendant's arguments are completely

23   stretched about the issues with the class definition and how

24   identifiable they are.  We've spoken to a lot of employees at

25   Wayfair.  We've got the front line customer service

1    representatives, we've got the care specialists.  These people

2    all have the same job duties.

3          So, you know, having said that, I don't think -- and,

4    by the way, the handbook, the employee handbook, it applies to

5    everybody, and the only timekeeping policy that is currently in

6    the record that is effective and in the record is the employee

7    handbook, which superseded the policy that they were relying on

8    in their opposition, and that applies to all employees, just

9    like the technical time policy expressly says this applies to

10:23AM 10    all hourly employees.

11          So I would just ask the Court to note that the

12    differences that defense counsel is trying to articulate today

13    are not relevant to the issue that is before the Court for

14    conditional certification.

15          MS. WOODWARD:  May I briefly respond to that, your

16    Honor?

17          THE COURT:  Yes.

18          MS. WOODWARD:  Just to my friend's point about the

19    opposition and describing the programs that all CSEs use, that

10:23AM 20    is not what the opposition says.  The opposition is specific on

21    page 3 that that discussion applies to CSEs who field incoming

22    calls for the entirety of their shift.  It does not apply to,

23    for example, trainers who only field calls some of the time and

24    therefore are not required to be call ready at the beginning of

25    their shift.  It is not required of employees who serve as

1    intermediaries between customers and suppliers, so I just

2    wanted to make that clear.

3          These differences are not academic, they're very real,

4    and the policies that plaintiffs are pointing to that allegedly

5    violate the law do not apply to three entire categories of

6    employees, who technically fall within their definition of CSE,

7    and, are, therefore, not similarly situated and not appropriate

8    for conditional certification.

9          THE COURT:  All right.  Here's what I'd like to do.

10:24AM 10   First, I agree with the sentiment that the standard here is

11   lenient, but it has to mean something, for whatever that's

12   worth.

13         I would like supplemental briefing or filing.  I would

14   like plaintiff to make a final stab at what you say the

15   definition of the collective should be as precise as you think

16   is defensible, whether by job title, description of duties,

17   being subject to the policy or program you say is unlawful,

18   however you want to frame it, but as precise and for these

19   purposes, anyway, final as you can make it, and then I'm going

10:25AM 20   to give Wayfair a chance to respond to that.

21         And I don't want to delay, so I'd like plaintiff to

22   file their proposed collective definition a week from today,

23   and I'll give Wayfair a week to respond to that, and then I'll

24   see whether I think that works or not, and we'll go from there.

25         And, again, I'm not ruling, this is not 12(b)(6) or

1   Rule 56, it is a lenient standard, but I do think it's, you

2   know, you couldn't say, for example, all employees of Wayfair.

3   I mean that wouldn't work, so we have to make this as precise

4   as we can.

5            MR. ASH:  Judge.

6            THE COURT:  The other thing just to reflect my current

7   thinking, my strong preference is to have the notice go out be

8   reasonably balanced.  I forgot to check whether the defendant

9   had put their version of events.  In other words, I'd like that

10  as well, if you haven't done that.  If you have, I just

11  neglected to read it, but, you know, these notices will say

12  plaintiff contends such-and-such, defendant contends

13  such-and-such.  I think the notice ought to, you have a

14  sentence or two, a paragraph maximum just what your response is

15  so the person reading it knows that this is at least the center

16  of the debate, and I'm disinclined, I guess, to send notice by

17  text.

18           I would need to be convinced to the extent there are

19  current employees, they are obviously pretty easy to contact,

20  former employees, I assume they have to leave a mailing address

21  or something.  There would be information there, but for a

22  variety of reasons, which I maybe don't need to go into, I

23  think text notices are suboptimal, but that's just me thinking

24  out loud.

25           Today is February 7th, if I have that right.

1          THE CLERK:  6th.

2          THE COURT:  I'm a day ahead of myself, February 13th

3    for plaintiffs, I'll just say supplemental filing and

4    February 20th for Wayfair's, and then I'll take it from there,

5    and, obviously, I'm going to take the arbitration issue into

6    account if I do certify the collective in whatever form.

7    Mr. Ash.

8          MR. ASH:  Yes, Judge, I just wanted to clarify one

9    thing on this.  You know, I think what we're talking about is

10:28AM 10   the defendant's nomenclatures as far as these different job

11   titles.  I mean they could change those tomorrow, and then --

12          THE COURT:  I'm going to leave it up to you, okay, to

13   define this within specific reasonable specificity that more or

14   less everyone reading it would know whether or not they are in

15   or out, and, of course, there's going to be debates around the

16   margin if the job titles are either too broad or too narrow,

17   maybe that's why you need to define and who are subject to this

18   policy.

19          MR. ASH:  Right.

10:29AM 20          THE COURT:  I don't know.  There has to be a

21   reasonable degree of specificity.

22          MR. ASH:  Okay.

23          THE COURT:  So that I don't want a thousand people to

24   opt in to this collective only to find that, you know, 908 of

25   them shouldn't be there.

1          MR. ASH:  Understood.

2          THE COURT:  On the other hand, if there are a thousand

3    people in the collective, it ought to be broad enough to

4    capture, I don't know, obviously, I don't know, but it ought to

5    be reasonably specific.

6          MR. ASH:  Okay.

7          THE COURT:  And I'll let Wayfair to it, you know, and

8    point out whatever problems they see with that.  Does all that

9    work?  And I'll take it under advisement.  I don't think we

10:29AM 10   need another hearing, and I'll leave it up to you to not to

11   rehash arguments you made already, but if you think there's

12   something here that needs response within reason, I'll permit

13   you to address that.

14          What I'm really looking at at this point is the -- I'm

15   going to want a specific definition of what the collective is

16   supposed to be, Wayfair's response to that on the assumption

17   that I will certify a collective in light of the lenient

18   standard, I'd like what Wayfair would want in the notice as

19   well, I'd like to know that.  All right.  Doses all that work?

10:30AM 20          MS. WOODWARD:  Yes, your Honor.

21          MR. ASH:  Yes, thank you, your Honor.

22          THE COURT:  All right.  Thank you.  Mr. Ash and

23   Mr. Rodriguez, I have one final question.  Are you now and have

24   you ever been a fan of the Detroit Lions?

25          MR. ASH:  Yes, your Honor, very big fan, very

1    heartbroken.

2          THE COURT:  I grew up in the State of Michigan.  I

3    have lived here for the better part of half a century, but I

4    was not happy with the playoff game.

5          MR. ASH:  I think we were the better team, just

6    inexperienced.  We gave it away in the third quarter.

7          THE COURT:  Well, I would put that on the coaches.

8    I've been watching Bill Belichick for a couple decades anyway,

9    and there's a pretty big difference between a good coach and a

10   bad one.  I should have sealed this part of the record.

11         Thank you, all.  I'll take it under advisement.

12         THE CLERK:  All rise.

13         (Whereupon, the hearing was adjourned at 10:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS ) ss.

5     CITY OF BOSTON )

6              I do hereby certify that the foregoing transcript,

7     Pages 1 through 23 inclusive, was recorded by me

8     stenographically at the time and place aforesaid in Civil

9     Action No. 23-11706-FDS, KAYLA COUNTS, KAYLYNN MAJOR,

10    AND NATHAN CHURCHILL, individually, and

11    on behalf of others as similarly situated vs. WAYFAIR, LLC and

12    thereafter by me reduced to typewriting and is a true and

13    accurate record of the proceedings.

14             Dated February 8, 2024.

15                         s/s Valerie A. O'Hara

16                         _____
                           VALERIE A. O'HARA
17                         OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25